Rockingham, }
Oct. 2, 1928. }

SADIE L. NORTON, *Guardian,* v. ATLANTIC GYPSUM
PRODUCTS COMPANY

*William H. Sleeper*, for the plaintiff.

*Sewall & Waldron* and *George R. Scammon*, for the defendant.

MARBLE, J.   The accident occurred at Portsmouth, August 13, 1926.  The plaintiff's ward was not quite sixteen years old.  He was a student in the local high school, and was working during the summer vacation.  At the time he received his injury he was stationed in the hold of a vessel helping to unload a cargo of gypsum.  This work was accomplished by means of a steam digger or clamshell bucket, so called.  Attached to both sides of the bucket were bars or arms, which permitted the two halves to open and close like the valves of a clamshell.  Between the hinges were pulleys or sheaves, which rose and fell simultaneously with the closing and opening of the bucket.

It was the duty of the plaintiff's ward and three other boys to guide the bucket, after it had been lowered through the hatch, to the pile of gypsum which was to be removed.  The swaying of the bucket as it was let down had caused it to strike against the sides of the hatchway and bend the bars.  This made it difficult to close the jaws completely, and the boys were accustomed to stand on the bucket, each grasping one of the arms, that their added weight might facilitate its proper operation.  They were so standing at the time of the accident.

The space between the bars and the pulleys, when raised, was made much smaller by the bent condition of the bars.  The plaintiff's ward stood with his hand grasping one of the bars, and as the pulleys rose with the closing of the jaws of the bucket, his fingers were crushed between the bar and the pulleys.  If the bars had not been bent, there would have been ample room for the insertion of his hand in this space.

The defendant's claim that the bending of the bars was due to the conduct of fellow-servants, whose negligence could not reasonably have been anticipated, is untenable.  The plaintiff's testimony tended

to prove that there was always danger that a steam bucket would strike against the sides of a hole or hatchway through which it was lowered, and that if it did so, it "couldn't help" bending the arms; that when the jaws of a bucket closed with difficulty it indicated that the bars were out of alignment; that the defendant knew that the bucket in question was not closing properly and either directed or permitted its employees to stand upon the bucket for the purpose of forcing the jaws together. See *Ducas* v. *Cotton Mills*, 81 N. H. 543, 545, and cases cited. There was no question but that the bars were actually bent; the defendant's yardmaster testified that after the accident he removed them from the bucket and sent them to the blacksmith's shop to be straightened.

Equally untenable is the defendant's contention that it was entitled to a directed verdict on the issues of contributory negligence and assumption of risk. The plaintiff's ward had been in the defendant's employ but a few hours; according to his testimony he received no instructions whatever and did not know that the bar which he gripped had become so bent that his hand was likely to be caught between it and the rising pulleys; he was young and inexperienced, and the appearance of the bucket was not such as to charge him with knowledge and appreciation of the danger. The court did not err in denying the defendant's motion. *Bilodeau* v. *Company, ante,* 196.

In the course of his argument to the jury counsel for the plaintiff said: "I was going to say this 'old oaken bucket,' this old out-of-repair bucket, . . . this old bucket that was all jammed and squeezed out of shape by being knocked against the coaming there so long. . . . They gave him that old dingled-danged-up bucket. . . . It was a piece of banged-up machinery and it wasn't fit to use; it wouldn't close; it kept drizzling out gypsum that might injure anybody. . . . They don't want the boy to get near the bucket, and still they want him to work on . . . this thing that wasn't fit to be used at all . . . and which laid down on them altogether a little while afterwards, and they couldn't use it at all, had to take it to pieces, take it to the blacksmith shop and have it re-jammed back."

Upon the court's suggestion that it was not in a strict sense the bucket itself which was jammed, counsel explained that he was referring in general terms to the "whole apparatus" and that he meant specifically the four arms. The defendant's signalman testified without objection that "once in a while there would some dust drop," and the plaintiff's ward himself declared that at times he and his companions had to run under the deck to get out of the way of the

rocks that dropped through the unclosed jaws of the bucket. One of the results of bent bars would be the "drizzling" of gypsum, and counsel was within his rights in commenting on this evidence. He did not claim that the plaintiff's ward was injured by the falling gypsum, and the defendant excepted only to the statement that "it [the bucket] wouldn't close" and that "it kept drizzling out gypsum." With reference to the statement that the bucket "laid down," there was testimony that two days after the accident "the bucket got so it wouldn't close" — that it "got so bad they hoisted it up on the pier" and then detached the bars with the object of having them straightened.

It is certain that the jury were not misled by these statements, and the fact that the language may have been somewhat picturesque did not render the argument improper. *State* v. *Dinagan*, 79 N. H. 7, 10; *State* v. *Small*, 78 N. H. 525, 530; *Tucker* v. *Henniker*, 41 N. H. 317, 323.

Plaintiff's counsel also said: "The boys of course went in with the honest purpose of trying to make a dollar there, and they . . . rushed them in there that way just for temporary purposes. Now . . . we know that they had ships there under charter coming in. Well, the purpose according to Douglass was to . . . save money."

The witness Douglass, on being asked if there was any occasion to unload fast, answered: "Yes, financially." And in explanation continued: "The ships are run by a charter, the more ships you could get in on that charter the cheaper the product would cost you. . . . These young fellows, they seem to stand it better than the old ones, that kind of hurried-up work."

The ruling that the argument was unobjectionable is sustained.

Since the other exceptions are not mentioned in the defendant's brief, they are presumably waived.

*Judgment on the verdict.*

PEASLEE, C. J., was absent: the others concurred.